**Carl EDLUND, Plaintiff–Appellant,**

v.

**Larry G. MASSANARI,\* Acting Commissioner of Social Security, Defendant–Appellee.**

No. 99–35555.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 16, 2001

Filed June 14, 2001

Amended Aug. 9, 2001.

---

\* Larry G. Massanari is substituted for Kenneth S. Apfel, Commissioner of the Social Security Administration, pursuant to Fed. R.App. P. 43(c)(2).

Ralph Wilborn, Eugene, Oregon, Elie Halpern, Olympia, Washington, for the plaintiff-appellant.

Katrina C. Pflaumer, United States Attorney, Brian C. Kipnis, Assistant United States Attorney, Lucille G. Meis, Regional Chief Counsel, Seattle Region, Daphne Banay, Assistant Regional Counsel, Social Security Administration, Seattle, Washington, for the defendant-appellee.

Before: B. FLETCHER, FERNANDEZ and PAEZ, Circuit Judges.

BETTY B. FLETCHER, Circuit Judge:

Carl Edlund appeals from the denial of his 1993 application for Social Security dis-

ability and supplemental benefits. Edlund has not engaged in substantial employment since June 1991, claiming both physical and mental impairments dating back to 1982. An Administrative Law Judge ("ALJ") denied his application for benefits, and the Social Security Appeals Council declined to review the ALJ's decision. Edlund then filed a complaint in the district court, which ruled in favor of the Commissioner. Edlund now appeals that decision.

Because we believe the ALJ erred in finding that Edlund failed to demonstrate a severe mental impairment under Step 2 of the five-step evaluative framework, we reverse the district court's decision upholding the Commissioner's denial of benefits and remand to the ALJ for a new Step 3 and Step 5 determination.

## I.

The appellant, Carl Edlund, is a fifty year-old former sawmill laborer who left school after the eighth grade. Edlund has also worked at various times as a dishwasher, leather cutter, Cat loader, and dump truck driver. However, he has remained largely unemployed since June 1991.

From December 1982 to June 1986, and again from May 1993 until the time of his administrative hearing in June 1995,[1] Edlund was examined by a series of doctors following an initial knee injury and subsequent complaints of hip and lower back pain. In addition, in September 1993, Edlund was treated several times for a fractured rib, for which he was given various pain medications. Virtually all of the doctors who examined Edlund over the years concluded that, apart from the rib fracture and in spite of his subjective complaints, there was little objective evidence of physi-

---

1. From 1986 until 1993, Edlund did not seek medical treatment.

cal abnormalities or damage, nor was there any evidence of Edlund's inability to work. However, one physician, Dr. Lance Christiansen, found that based on his observations over a five-month period beginning in April 1995, Edlund was probably suffering from a herniated disk in his lower back. On the assumption that an MRI scan would confirm his diagnosis, Dr. Christiansen stated that Edlund was "probably a candidate for surgery on his lower back." In addition, Dr. Christiansen opined that Edlund did not "ha[ve] a chance of getting back to meaningful work without getting this fixed."

Edlund was also examined by a psychologist, Dr. Jeff Bremer, in November 1993 and March 1994.[2] Based on the November 1993 evaluation, Dr. Bremer described Edlund as "markedly depressed and anxious" and in need of "supportive counseling and psychiatric evaluation." All told, Edlund "was found to meet the state's criteria as 'seriously disturbed' and to be 'at high risk of relapse.'" In March 1994, Dr. Bremer diagnosed Edlund with atypical (agitated) depression, alcohol dependence, and prescription drug (Valium) abuse.[3] In addition, based on the results of a battery of tests, Dr. Bremer estimated Edlund's general learning ability in the low average range, based on a full scale IQ at 87, with reading and spelling skills at the third-grade level, and arithmetic skills at the sixth-grade level. Dr. Bremer reported these results as being reasonably valid and reliable. Other results showed that Edlund was significantly below average on the delayed recall index, although Dr. Bremer observed that emotional and moti-

vational factors likely affected this score. Finally, Dr. Bremer noted that with respect to a comprehensive personality test, Edlund "appears to have attempted to portray himself in an especially negative or pathological manner. . . . Test results, therefore, are considered to involve considerable distortion and are invalid. He sees his life as severely disrupted by a variety of physical problems, depressive symptomatology, high anxiety, and suspiciousness and hostility with his relationships with others."

As for work-related activities, Dr. Bremer determined that Edlund had only a "fair"[4] ability to relate to co-workers, deal with the public, exercise judgment, interact with supervisors, remember and carry out complex job instructions, and function independently. He was deemed to have only "fair" or "poor to no[ ]" ability to deal with work stressors. On the other hand, Edlund was assessed to have "good" ability to follow work rules and carry out simple job instructions, and "good to fair" ability to maintain concentration. Finally, Dr. Bremer determined that while Edlund could satisfactorily maintain his personal appearance, he had only "fair" ability to behave in an emotionally stable manner, to relate predictably in social situations, and to demonstrate reliability. In sum, Dr. Bremer concluded:

> Mr. Carl Edlund impressed me as a markedly depressed and anxious, separated, 43–year–old man of low average intelligence with learning disabilities in reading and writing, who is dependent on "street" Valium and has little social

---

**2.** Dr. Bremer also conducted a further assessment of Edlund's ability to perform work-related activities in April 1994.

**3.** On June 5, 1995, Edlund's former attorney received a letter reporting the results of Edlund's treatment at a chemical dependency treatment program. Edlund was discharged

from the program in October 1994, at which time he reported not drinking for one and one-half years and completing twelve monthly meetings.

**4.** "Fair" is defined as follows: "Ability to function in this area is seriously limited, but not precluded."

support. He could benefit from timely concurrent psychologic/psychiatric and chemical dependency counseling. It would be futile, I believe, to address one without the other.

Multiple disabilities, discussed above, lead to restriction of activities of daily living judged to be currently moderate; moderate to marked difficulties maintaining social functioning; frequent deficiencies of concentration, persistence and pace; and repeated episodes of deterioration or decompensation in work or work-like settings are anticipated, without comprehensive treatment....

In January 1993 and April 1993, Edlund applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f, respectively.[5] Following the denial of his applications, he requested reconsideration in October 1993. His applications were denied once again, and on April 21, 1994, he filed a request for a hearing. An administrative law judge ("ALJ") reopened Edlund's 1993 applications for good cause and conducted a hearing on June 29, 1995.

Edlund, his girlfriend Kim Lay, and a vocational expert testified at the hearing. In his testimony, Edlund maintained that he suffered from concentration problems as well as depression and anxiety. He also testified that he had reduced his alcohol and Valium intake. Critically, however, Edlund also admitted that he continued to abuse drugs and alcohol and that his addiction caused him to exchange his prescription painkillers (probably obtained from Dr. Christiansen) for Valium on the street. Finally, Edlund also stated that he could lift up to fifteen pounds without significant pain in his shoulder or back, and that he could be up on his feet for 45 minutes at a time. For approximately two to four days per month, Edlund stated that he needed to lie down five to six hours during the day.

The ALJ subsequently rendered an adverse decision denying benefits on December 4, 1995. Citing his apparent "ruse to obtain prescription drugs for trade," the fact that he did not seek treatment from 1986 until 1993, and "the absence of severe objective medical findings" supporting the existence of severe pain, the ALJ discredited Edlund's subjective complaints of pain. The ALJ also refused to credit Edlund's girlfriend's testimony regarding Edlund's pain symptoms and diminished substance abuse due to a perceived conflict of interest. Significantly, citing Dr. Bremer's observations about probable distortions in Edlund's psychological evaluation due to emotional and motivational factors (as well as possible substance abuse), the ALJ "f[ou]nd that the claimant has no severe mental impairment which would limit his capacity to perform substantial gainful work activity." Finally, the ALJ adopted the vocational expert's opinion regarding the existence of grader/sorter and assembler positions that Edlund could perform even with his impairments. In sum, despite finding that Edlund suffered from "severe orthopedic impairments" and was unable to perform his past work as a sawmill laborer, the ALJ denied his application for benefits on the grounds, inter alia, that none of his impairments qualified as a per se disability under Step 3 of the evaluating criteria; the objective findings of any disability were "minimal" and Edlund's subjective complaints were not credible; and that with his residual functional capacity, Edlund could perform less-taxing jobs that existed in significant numbers in the regional and national economy.

Edlund asked the Social Security Appeals Council to review the ALJ's decision.

---

5. Edlund had previously filed applications for such benefits in October 1986.

In a letter dated February 19, 1998, the Appeals Council stated that even after receiving Dr. Christiansen's letter, it found no basis for reviewing the ALJ's decision. In particular, the Appeals Council cited the fact that no MRI scan had ever been conducted to confirm Edlund's complaints (as well as Dr. Christiansen's diagnosis). Furthermore, it pointed to the lack of laboratory reports, clinical findings or treatment records to support Dr. Christiansen's conclusion that Edlund was suffering from a herniated disk and was unable to work. Accordingly, the Appeals Council declined Edlund's request for review, and at that point the ALJ's decision became the final decision of the Commissioner of the Social Security Administration ("Commissioner"). On March 11, 1998, Edlund filed a complaint appealing the Commissioner's decision to the U.S. District Court for the Western District of Washington. The case was submitted to a magistrate judge, who recommended in favor of the Commissioner. The district court adopted the magistrate judge's report and recommendation on April 2, 1999.

## II.

In this appeal, Edlund claims, *inter alia*, that the ALJ erred as a matter of law in failing to credit the diagnosis of his treating physician, Dr. Christiansen, as well as the uncontradicted report of the examining psychologist, Dr. Bremer. In addition, Edlund argues that the ALJ's decision was not supported by substantial evidence.

We have jurisdiction pursuant to 28 U.S.C. § 1291.

■■■ A district court's order upholding the Commissioner's denial of benefits is reviewed *de novo*. *Harman v. Apfel*, 211 F.3d 1172, 1174 (9th Cir.2000). The decision of the Commissioner may be reversed only if it is not supported by substantial evidence or if it is based on legal error. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th

Cir.1999). Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance. *Id.* at 1098. Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner. *Tackett*, 180 F.3d at 1097; *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir.1999).

■■■ The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.1995). The ALJ's determinations of law are reviewed *de novo*, although deference is owed to a reasonable construction of the applicable statutes. *McNatt v. Apfel*, 201 F.3d 1084, 1087 (9th Cir.2000).

## III.

Under the Social Security Act, individuals who are "under a disability" are eligible to receive benefits. 42 U.S.C. § 423(a)(1)(D). A "disability" is defined as "any medically determinable physical or mental impairment" which prevents one from engaging "in any substantial gainful activity" and is expected to result in death or last "for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Such an impairment must result from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). The Act also provides that a claimant will be eligible for benefits only if his impairments "are of such severity that he is not only unable to do his previous work but cannot, considering his

age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). Thus, the definition of disability consists of both medical and vocational components.

In evaluating whether a claimant suffers from a disability, an ALJ must apply a five-step sequential inquiry addressing both components of the definition, until a question is answered affirmatively or negatively in such a way that an ultimate determination can be made. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). "The claimant bears the burden of proving that [ ]he is disabled." *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir.1999). This requires the presentation of "complete and detailed objective medical reports of h[is] condition from licensed medical professionals." *Id.* (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

*Treating Physician Rule*

As Edlund's treating physician, Dr. Christiansen's diagnosis is owed considerable deference. "Because treating physicians are employed to cure and thus have a greater opportunity to know and observe the patient as an individual, their opinions are given greater weight than the opinions of other physicians." *Smolen*, 80 F.3d at 1285; *see also* SSR 96–2p. A treating physician's medical opinion as to the nature and severity of an individual's impairment must be given controlling weight if that opinion is well-supported and not inconsistent with the other substantial evidence in the case record. SSR 96–2p. Even when not controlling, "treating source medical opinions are still entitled to deference and must be weighed" using factors listed in the regulations. SSR 96–2p; 20 C.F.R. § 404.1527; 20 C.F.R. § 416.927.[6] And "[e]ven if contradicted by

another doctor," the testimony of a treating physician "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 829. Under SSR 96–2p, reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

As discussed above, the ALJ and the Appeals Council cited, *inter alia*, a lack of objective clinical or laboratory findings as grounds for rejecting Dr. Christiansen's diagnosis that Edlund was suffering from a herniated disk in his lumbar region, which in turn required surgery and prevented him from performing any meaningful work. Furthermore, the Appeals Council noted the conditional nature of Dr. Christiansen's analysis, predicated on the results of an MRI scan which was never actually performed. Given that numerous other physicians who had examined Edlund over the years found little objective indication of serious physical impairment, thus contradicting Dr. Christiansen's diagnosis, the ALJ was only required to provide specific and legitimate reasons for rejecting his opinion.

■ We believe the ALJ succeeded in meeting this standard. In particular, the ALJ cited the likelihood that unbeknownst to Dr. Christiansen, Edlund was exaggerating his complaints of physical pain in order to receive prescription pain medication to feed his Valium addiction. Accordingly, the ALJ properly concluded that "the claimant's complaints are not credible or supported by substantial evidence." Furthermore, it is worth remembering that the ALJ did find that Edlund's various physical ailments met the Step 2

---

**6.** The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527.

requirement for severe orthopedic impairment overall, and that such impairment prevented his return to work as a sawmill laborer under Step 4. She only concluded that Edlund did not meet the Step 3 listings for per se disability, and that there were other jobs he could perform in the national economy under Step 5. In so doing, the ALJ rejected the possibility, put forth by Dr. Christiansen, that Edlund might be completely precluded from any meaningful work activity whatsoever. For the reasons described above, this conclusion was justified even in light of the treating physician rule.

Edlund argues for the first time on appeal that the ALJ erred because she failed to fully develop the facts by seeking more information from Dr. Christiansen. According to Edlund, particularly because the ALJ cited the lack of supporting clinical or laboratory findings as grounds for rejecting his diagnosis, she was required to call witnesses (most notably Dr. Christiansen himself) or order procedures (such as an MRI) to resolve these issues. *See* 20 C.F.R. § 404.1512(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical or laboratory diagnostic techniques."); SSR 96–2p ("[T]he ALJ ... may need to consult a medical expert to gain more insight into what the clinical signs and laboratory findings signify in order to decide whether a medical opinion is well-supported or whether it is not inconsistent with other substantial evidence in the case record.").

However, because this claim was not raised in the district court, we will not consider it here.

In sum, although the treating physician's opinion is entitled to great weight, the ALJ is not compelled under the treating physician rule to simply discard the contrary opinions of other examining physicians. Rather, the ALJ cited sufficiently specific and legitimate reasons for discrediting Dr. Christiansen's diagnosis.[7]

*Examining Psychologist*

■ The ALJ's handling of Dr. Bremer's evaluation, however, was considerably more problematic. In particular, in determining that Edlund did not have a "severe mental impairment," the ALJ appears to have applied a more stringent legal standard than is warranted by law. We have defined the step-two inquiry as "a de minimis screening device to dispose of groundless claims." *Smolen,* 80 F.3d at 1290 (citing *Bowen v. Yuckert,* 482 U.S. 137, 153–54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). "Important here, at the step two inquiry, is the requirement that the ALJ must consider the combined effect of all of the claimant's impairments on h[is] ability to function, without regard to whether each alone was sufficiently severe." *Id.* Given the uncontroverted diagnosis of the examining psychologist, Dr. Bremer, as to Edlund's symptoms of agitated depression and anxiety, we believe the ALJ lacked substantial evidence for dismissing Edlund's claim of a severe mental impairment at Step 2.

Indeed, the ALJ erred in failing to meet, either explicitly or implicitly, the standard of clear and convincing reasons required to reject an uncontradicted opinion of an ex-

---

**7.** Other claims raised by Edlund for the first time on appeal—including challenges to the ALJ's rejection of Edlund's subjective testimony, her rejection of Kim Lay's testimony, her conclusory Step 3 equivalence finding, her application of Rule 202.17 given Edlund's functional illiteracy, and her finding that Edlund could perform simple work tasks—have also been waived and will not be considered in this appeal.

amining psychologist. *Lester v. Chater,* 81 F.3d 821, 830 (9th Cir.1995). Under Step 2, the applicable regulations state that "[a]n impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). "Basic work activities" are defined as including such capabilities as use of judgment, 20 C.F.R. § 404.1521(b)(4); responding appropriately to supervision, co-workers and usual work situations, 20 C.F.R. § 404.1521(b)(5); and dealing with changes in a routine work setting, 20 C.F.R. § 404.1521(b)(6).

As noted above, Dr. Bremer specifically found that Edlund suffered from severe depression and had only a "fair"—defined as "seriously limited," see *supra* note 4— ability to relate to co-workers, deal with the public, exercise judgment, interact with supervisors, remember and carry out complex job instructions, and function independently. He was also deemed to have only "fair" or "poor to no[ ]" ability to deal with work stressors, and only "fair" ability to behave in an emotionally stable manner, to relate predictably in social situations, and to demonstrate reliability. Given this diagnosis, the ALJ's Step 2 determination was erroneous under a "de minimis" standard.

To be sure, the ALJ correctly noted that Dr. Bremer expressed doubts about the reliability of Edlund's scores on the comprehensive personality test and the delayed recall index. She also was understandably concerned that Edlund may have been illegally trading his pain medication for Valium and even acting under the influence of Valium or alcohol at the time of the examination. *Cf. Morgan v. Commissioner,* 169 F.3d 595, 602–03 (9th Cir.1999); *Andrews v. Shalala,* 53 F.3d

1035, 1039–43 (9th Cir.1995). We nonetheless believe that the ALJ selectively focused on aspects of Dr. Bremer's 1994 report which tend to suggest non-disability, and apparently failed to realize that under the law, her conclusion required clear and convincing reasons. *See Winans v. Bowen,* 853 F.2d 643 (9th Cir.1987).

The Commissioner argues that "the ALJ implicitly gave clear and convincing, and specific and legitimate reasons for rejecting Dr. Bremer's 1994 opinions on the severity of Mr. Edlund's mental condition." However, with respect to the possibility that Dr. Bremer's test results may have been distorted by Edlund's substance abuse—something which Dr. Bremer himself never suggested was true—the ALJ appears to have contradicted herself by finding that the "claimant appears to be capable of controlling his drug and alcohol use and there is no evidence of severe mental limitations *resulting from this use*" (emphasis added). In so finding, the ALJ necessarily discounted the likelihood that any mental impairments observed by Dr. Bremer (as well as their severity) were the result of drug or alcohol abuse. Furthermore, such concerns and speculation on the part of the ALJ do not amount to substantial evidence—much less clear and convincing reasons. In sum, the ALJ appears to have relied on her doubts about Edlund's overall credibility to reject the entirety of Dr. Bremer's report, including portions that Dr. Bremer deemed to be reliable.[8]

Pursuant to the SSA's own internal procedures, once a claimant has shown that he suffers from a medically determinable impairment, he next has the burden of proving that these impairments or their symptoms affect his ability to perform basic

---

8. Notably, the ALJ failed to even mention Dr. Bremer's November 1993 check-off report in her decision.

work activities. Social Security Ruling ("SSR") 96–3p; SSR 96–7p. If he meets this burden, the ALJ *must* find that the impairment is "severe" and move to the next step in the SSA's five-step process. SSR 96–3p (emphasis added). Furthermore, because the ALJ "fail[ed] to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of law." *Lester,* 81 F.3d at 834 (internal quotations omitted). Accordingly, we find the ALJ committed reversible error and remand the case to the ALJ for the requisite Step 3 analysis.[9] Furthermore, the ALJ failed to factor Edlund's mental impairments into her Step 5 analysis regarding Edlund's residual capacity to perform other jobs; significantly, the hypothetical that she posed to the vocational expert with respect to the availability of positions meeting Edlund's requirements failed to include consideration of such impairments. *See De-Lorme v. Sullivan,* 924 F.2d 841, 850 (9th Cir.1991) ("If the hypothetical does not reflect all the claimant's limitations … the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy."); *Embrey v. Bowen,* 849 F.2d 418, 423 (9th Cir.1988); *Gallant v. Heckler,* 753 F.2d 1450 (9th Cir.1984).

In sum, because Dr. Bremer's observations were uncontroverted, the ALJ was required to provide clear and convincing reasons before rejecting them. This she failed to do. In particular, the ALJ erred in discarding the entirety of Dr. Bremer's report, including portions that he deemed to be reliable. Accordingly, the ALJ's de-

cision lacks substantial evidence with respect to her finding that Edlund was not suffering from a severe mental impairment. As a result of the error, the ALJ failed to consider whether Edlund's symptoms of depression and anxiety amounted to a listed impairment under Step 3; furthermore, she failed to factor such considerations into her Step 5 analysis regarding Edlund's residual physical and mental capacity to perform other jobs.

## IV.

The ALJ provided sufficient reasons for rejecting the diagnosis of Edlund's treating physician, Dr. Christiansen. However, we reverse the SSA's denial of benefits because the ALJ failed to apply the correct legal standard in rejecting Dr. Bremer's psychological evaluation, and because her conclusion that Edlund did not suffer from a severe mental impairment was not supported by substantial evidence. On remand, the ALJ should reconsider her Step 3 and Step 5 determinations in light of Edlund's demonstrated mental impairment.

**REVERSED AND REMANDED.**

---

9. In particular, Edlund now argues that Dr. Bremer's diagnosis meets the definition of Listing 12.04 in Appendix 1, Subpart P, Regulation No. 4. As a result, Edlund claims that he should be found to be presumptively disabled under Step 3. In response, the Commissioner argues that Edlund waived this claim for failure to raise it with the Appeals Council

and in the district court. The SSA's argument with respect to the Appeals Council is foreclosed by the recent holding in *Sims v. Apfel,* 530 U.S. 103, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000). However, the SSA correctly argues that because Edlund did not raise this Step 3 argument in the district court, we may not consider it in this appeal.