# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JA'VONCE WARRE, on behalf of
E.T. IV, a minor child,
      *Plaintiff-Appellant,*

v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,
      *Defendant-Appellee.*

No. 04-35778

D.C. No.
CV-03-01072-HO

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael R. Hogan, District Judge, Presiding

Submitted November 14, 2005*
Portland, Oregon

Filed February 17, 2006

Before: Warren J. Ferguson, Andrew J. Kleinfeld, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Ferguson

---

*This panel unanimously finds this case suitable for decision without
oral argument. Fed. R. App. P. 34(a)(2).

## COUNSEL

David B. Lowry, Portland, Oregon, for the plaintiff-appellant.

Leisa A. Wolf, Assistant Regional Counsel, Social Security Administration, Seattle, Washington, for the defendant-appellee.

---

**OPINION**

GRABER, Circuit Judge:

Plaintiff Ja'Vonce Warre appeals from the district court's affirmance of a decision to terminate the Supplemental Security Income ("SSI") benefits of her minor son. We hold that (1) the Commissioner of Social Security permissibly interpreted Listing 100.02A, which defines a growth impairment to be a disability, to require a continuing reduction in a child's growth velocity, rather than a mere continuation of shorter stature; and (2) substantial evidence supports the finding that Plaintiff's son had medically improved to the point where he no longer met Listing 100.02A. Accordingly, we affirm the decisions below.

## FACTS AND PROCEDURAL HISTORY

The pertinent facts are, for the most part, undisputed. Plaintiff applied for SSI benefits in 1996 on behalf of her son E.T. IV, who was then seven months old. *See* 20 C.F.R. § 416.924 (defining eligibility for a child's SSI benefits). The child is diagnosed with isovaleric acidemia, a rare metabolic disorder that causes concentrations of protein in the blood and tissues. Upon consideration of the 1996 application, an administrative law judge ("ALJ") found E.T. IV to be disabled because his impairment met the criteria of Listings 100.02 and 110.07C, 20 C.F.R. pt. 404, subpt. P., app. 1.[1] His head size was below

---

[1] Listing 100.02 defines as a disability:

   Growth impairment, considered to be related to an additional specific medically determinable impairment, and one of the following:

the fifth percentile, his height was at the forty-fifth percentile, and his social/emotional development was at a level that was less than fifty percent of his chronological age. By the age of seven months the child had been hospitalized approximately 14 times due to his condition.

The Social Security Administration ("SSA") conducted a continuing disability review in 2001. *See* 20 C.F.R. § 416.989 (explaining that the agency must evaluate recipients of SSI benefits from time to time to determine their continuing eligibility for benefits). The SSA found that E.T. IV had experienced "medical improvement" and that he was no longer eligible for SSI benefits. *See* 20 C.F.R. § 416.994a (stating that SSI benefits may be terminated if the recipient has medically improved and is not currently disabled).

Plaintiff requested a hearing, which took place on October 15, 2002. *See* 20 C.F.R. § 416.1430 (providing for a hearing before an ALJ). Plaintiff, the child's father, and medical expert Dr. Perry Grossman testified. The ALJ also considered documentary evidence from the child's treating physicians and his school.

At the time of the 2002 hearing, E.T. IV was seven years old. According to the evidence, he slept excessively, experienced periods of lethargy, urinated frequently, sometimes wet

---

    A.   Fall of greater than 15 percentiles in height which is sustained; or

    B.   Fall to, or persistence of, height below the third percentile.

Listing 110.07 defines as a disability:

    Multiple body dysfunction due to any confirmed hereditary, congenital, or acquired condition with one of the following:

    . . . .

    C.   Growth impairment as described under the criteria in 100.02A . . . [.]"

his bed and, because of the medications that he was taking, smelled fishy when he perspired. E.T. IV had not been hospitalized since 2000, although he was taken to the emergency room once in 2002 due to lethargy. He missed 21 days of school during the 2000-2001 academic year because of his illness.

The child's parents testified that he was very forgetful and learned slowly, but his teachers reported that he functioned at grade level, had a normal attention span, and showed continued growth in his academic and social skills. He was found to socialize well and to be generally an active child with normal strength, coordination, and gait.

In 1998, E.T. IV's height was in the fiftieth percentile. In 1999 he dropped to the twenty-fifth percentile in stature. In 2000 and 2001, his height remained in the twenty-fifth percentile. Early in 2000, his weight was in the twenty-fifth percentile as well; by October of that year his weight had risen to the fiftieth percentile. At the time of the hearing, his head circumference also was near the fiftieth percentile.

At the 2002 hearing, Dr. Grossman testified that E.T. IV did not meet the criteria for Listing 100.02A because that Listing requires a "sustained decrease in the growth velocity." For this child, "the change didn't persist. What persisted was his height at the new percentile." In other words, for more than two years E.T. IV's height had remained stable at the twenty-fifth percentile, rather than continuing to slow down. Dr. Grossman testified that the child's prognosis was good and that "he's gotten over the most difficult period in his life."

Due to his condition, E.T. IV had to follow a strict low-protein diet and take medications daily. His medications included carnitine, which cost $250 per month; glycine, which cost $150 per month; and calcium carbonate and iron supplements, which cost $16 per month. Without those medications, E.T. IV is at high risk of brain damage or death. Even with

proper treatment, he is at risk for developmental delay or brain damage "in the event that he is affected by an acute episode of illness that results in extreme metabolic acidosis that cannot be controlled." At the time of the 2002 hearing, Plaintiff and the child's father did not have health insurance apart from the child's eligibility for SSI benefits.

The ALJ determined that E.T. IV had experienced medical improvement. He found that E.T. IV's impairment no longer met or medically equaled Listing 100.02 because, "[a]lthough the claimant has had a fall of greater than 15 percentiles in height, the medical records document the claimant has been growing along the 25th percentile since February 2000."[2] Next, the ALJ found that E.T. IV's impairment was severe, but not disabling; although the child was "a[t] risk for medical decompensation and/or death without his medications, his ability to function in an age appropriate manner is only mildly impacted." The ALJ also considered whether the impairment was functionally equivalent to any listed impairment. He found that E.T. IV was markedly limited in the domain of health and physical well-being but, because he did not have extreme limitations in any one domain of functioning or marked limitations in any two domains of functioning, the impairment was not functionally equivalent to any listed impairment. *See* 20 C.F.R. § 416.926a (providing standard). Accordingly, the ALJ concluded that E.T. IV was no longer eligible for SSI benefits.

Plaintiff appealed to the district court, which affirmed the ALJ's 2002 decision. Plaintiff now timely appeals to us.

---

[2]Because the earlier finding that the child met Listing 110.07 depended on his meeting the criteria in Listing 100.02A, the ALJ's conclusion necessarily meant that the child no longer met Listing 110.07, either. *See supra* note 1.

## STANDARD OF REVIEW

We review de novo a district court's decision upholding the denial of social security benefits. *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004). We must affirm the decision if it is supported by substantial evidence, which is "more than a mere scintilla but not necessarily a preponderance." *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003).

## DISCUSSION

### A.   *The Meaning of Listing 100.02A*

[1] The principal issue in this appeal is whether the district court and the ALJ properly interpreted Listing 100.02A, which requires a "*[f]all* of greater than 15 percentiles in *height which is sustained.*" (Emphases added.) Plaintiff argues that the italicized phrase plainly means that a person must sustain a fall in height that is never recovered. By contrast, the Commissioner of Social Security argues that "sustained" in this context means accompanied by a continuing reduction in growth velocity — in other words, not merely that the child remains shorter in stature, but that his growth *rate* has slowed.

[2] In our view, Listing 100.02A is ambiguous. It is unclear whether the "fall" (reduction in percentiles) must be "sustained," as the Commissioner argues, or whether only the reduced "height" must be "sustained," as Plaintiff contends. The text of the Listing reasonably supports the meanings urged by both parties.

[3] In that circumstance, the Commissioner's plausible interpretation of her agency's own regulation is entitled to deference. *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001). Here, the Commissioner's interpretation is consistent with the wording of the regulation and the governing statute; indeed, it is the more sensible reading in terms of

what the Listing is trying to describe — a child who is not just short in stature, but whose *growth pattern* is so abnormal that he should be defined as disabled. Were we to adopt Plaintiff's interpretation, many a nondisabled child who simply ends a growth spurt would be defined as disabled.

[4] The Commissioner's interpretation also is more consistent with the Listing's context. Listing 100.02B defines a growth impairment involving a "[f]all to, or persistence of, height below the third percentile." Listing 100.02A omits "persistence of" height more than 15 percentiles below a child's previous height; yet this is the reading that Plaintiff would have us adopt. *See SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) ("It is a well-established canon of statutory interpretation that the use of different words or terms within a statute demonstrates that [the drafter] intended to convey a different meaning for those words.").

Finally, in support of the ALJ's and the district court's holdings, the Commissioner relies on the Program Operations Manual System ("POMS"), an internal SSA document. POMS section DI 24598.020 states that "a child whose growth delay satisfies the criteria specified in Listings 100.02A or 100.03 but whose fall in growth is not also accompanied by a *continuing reduction* in growth velocity, does not meet the severity level of those listings."[3] The POMS

---

[3]We reject Plaintiff's argument that, by citing the POMS, the Commissioner is supplying a post-hoc rationalization for the ALJ's decision. Although the ALJ did not cite the POMS, the medical expert who testified at the hearing did, and the ALJ clearly credited the expert's and the Commissioner's interpretation of the Listing. The Commissioner is not asking this court to invent a new ground of decision; rather, the POMS simply is additional support for the Commissioner's and the ALJ's position.

We also reject Plaintiff's argument that this POMS section adds a substantive requirement to Listing 100.02 and is therefore invalid. Although policies authorized by the POMS that go beyond the SSA's governing statute and regulations may not be valid, *see Briggs v. Sullivan*, 886 F.2d 1132, 1144 (9th Cir. 1989), that is not the case here. The POMS merely interprets the Listing in question.

does not have the force of law, but it is persuasive authority. *Hermes v. Sec'y of Health & Human Servs.*, 926 F.2d 789, 791 n.1 (9th Cir. 1991).

**[5]** For all these reasons, we hold that the district court and the ALJ did not err in holding that Listing 100.02A requires a continuing reduction in growth velocity.

B.   *Substantial Evidence of Medical Improvement*

**[6]** Next, we consider whether substantial evidence supports the finding of the ALJ and the district court that E.T. IV no longer met Listing 100.02A.[4] We hold that substantial evidence supports that conclusion, even though the child still suffers from the same metabolic disorder that previously rendered him disabled. It is undisputed that, at the time of the 2002 hearing, the child had steadily maintained growth at the twenty-fifth percentile for more than two years. In addition, the child's head size, intellectual development, academic functioning, socialization, attention span, strength, coordination, and gait had come within a normal range.

**[7]** "Medical improvement" is defined as

> any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled. . . . A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs, or laboratory findings associated with [claimant's] impairment(s).

---

[4]It is undisputed that E.T. IV does not meet the criteria of Listing 100.02B.

20 C.F.R. § 416.994a(c). In other words, the key question is not whether the claimant still suffered from the same medical problem he had when benefits were awarded, but whether the severity of the problem had decreased sufficiently to enable him to engage in gainful activity. In short, E.T. IV's continuing diagnosis of isovaleric acidemia did not preclude a finding of medical improvement.

[8] Neither did the difficult economic circumstance of the child's family preclude a finding that he was no longer disabled. Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits. *See, e.g.*, *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987); *see also Odle v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983) (affirming a denial of benefits and noting that the claimant's impairments were responsive to medication). It is true that benefits may not be denied to a disabled claimant because of a failure to obtain treatment that the claimant cannot afford. *See, e.g.*, *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995). This rule implements the agency's official policy: Social Security Ruling ("SSR") 82-59 provides that an individual's failure to follow prescribed treatment is justifiable if the individual is unable to afford such treatment. *See id.* (noting that SSR 82-59 interprets 20 C.F.R. §§ 404.1530 and 416.930 and is binding on the SSA). But there is no statutory, regulatory, or judicial authority to support the rule that the dissent urges us to adopt, namely, that disability benefits may not be discontinued if the claimant cannot afford treatment without them. To the contrary, in the only reported case in which this rule was proposed, the Fifth Circuit flatly rejected it. *Burnside v. Bowen*, 845 F.2d 587, 592 (5th Cir. 1988), *abrogated on other grounds by Sullivan v. Zebley*, 493 U.S. 521, 527 n.5 (1990).

It may be that the dissent's rule would comport best with the Social Security Act's overall purpose. *See* dissent at 1777. On the other hand, holding that a claimant is entitled to con-

tinue receiving SSI benefits when the claimant's impairment is *not* presently disabling, but when the claimant instead seeks SSI benefits as a means of affording medication to prevent his impairment from becoming disabling at an unknown time in the future, could "open the door to virtually unlimited claims for preventative benefits." *Burnside*, 845 F.2d at 592. Deciding between these competing policies is a choice for Congress and the SSA in the first instance.

Finally, neither the ALJ nor the district court made a factual finding that the family does not have, or cannot find, resources for obtaining medications for E.T. IV. *See* SSR 82-59 (requiring all possible community resources to be explored and claimant's financial circumstances to be documented). Plaintiff may be eligible for other forms of assistance that will allow her to continue to purchase her son's expensive medications. *See, e.g.*, Or. Rev. Stat. § 414.706(3) (funding health services for persons under age 19 with incomes no more than 200 percent of federal poverty guidelines). Plaintiff does not ask this court for a remand for factual findings. Thus, the question whether the family can afford E.T. IV's medications and, if not, whether their financial condition entitles him to continuing benefits, is not squarely presented.

C.   *Functional Equivalence to a Listed Impairment*

Plaintiff also argues that the Commissioner erred in finding that E.T. IV's condition is not functionally equivalent to a listed impairment. 20 C.F.R. § 416.926a. Although Plaintiff made that argument to the Commissioner, she did not raise it before the district court. Accordingly, this issue is waived, *Edlund v. Massanari*, 253 F.3d 1152, 1158 n.7 (9th Cir. 2001), and we do not consider it.

AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

Without his costly medication and special vegetarian diet, E.T. IV will suffer progressive brain damage and other complications of his inherited disease, isovaleric acidemia, that will lead to his death. The majority would discontinue E.T. IV's SSI benefits without considering whether his mother, the Plaintiff, can independently afford his life-saving medication.

The Plaintiff contends, and there are no facts in the record to refute her claim, that she cannot afford her son's treatment without the assistance of his SSI benefits. For nearly six years, the Plaintiff received SSI benefits on behalf of E.T. IV because her income was consistently below the level necessary to qualify her for government assistance. *See* 20 C.F.R. § 416.202 (to qualify for SSI benefits, claimant must not have more income or resources than are permitted). At the time of the administrative hearing, neither the Plaintiff nor E.T. IV's father had health insurance that would cover E.T. IV. While the majority suggests that the Plaintiff will be able to secure state assistance to pay for her son's treatment, maj. op. at 1773-74, the Plaintiff contends that under-funding of the Oregon state health plan will leave her son without the treatment he needs. Based on the Plaintiff's established income qualification for SSI, and the lack of facts refuting that qualification, we can only conclude that the Plaintiff cannot independently afford her son's expensive medication and diet. Therefore, to deny E.T. IV his SSI benefits is to deny him his life-saving treatment.

I cannot condone permitting a nine-year old boy to suffer brain damage and death. For this reason, I dissent.

*****

The law of this Circuit does not compel the majority's conclusion that this Court should uphold the discontinuance of E.T. IV's SSI benefits. Indeed, firmly-established precedent

requires the SSA to take a claimant's ability to afford necessary treatment into account when making an initial determination regarding whether the claimant is disabled, and therefore entitled to SSI benefits. *See, e.g.*, *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir. 1995). This principle can and should be extended to ALJ decisions made in the context of continuing disability reviews.

In reaching its conclusion, the majority relies on the proposition that "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of eligibility for SSI benefits." Maj. op. at 1773. This statement is only partially correct. Impairments that can be controlled effectively with medication are not disabling for the purpose of SSI eligibility *if* the claimant can obtain the medication, but chooses not to without good reason. *See Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004) ("Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits." (internal quotation marks omitted)). Claimants who cannot afford necessary medication or treatment, however, cannot be denied benefits on the basis that they have not undergone such treatment. *See, e.g.*, *Gamble*, 68 F.3d at 321 (holding that "[d]isability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds"); *Brown*, 390 F.3d at 540 (recognizing that " 'a lack of sufficient financial resources to follow prescribed treatment to remedy a disabling impairment may be . . . an independent basis for finding justifiable cause for noncompliance [with prescribed treatment]' " (quoting *Tome v. Schweiker*, 724 F.2d 711, 714 (8th Cir, 1984))); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987) (holding that if "the claimant cannot afford the prescribed treatment or medicine, and can find no way to obtain it, the condition that is disabling in fact continues to be disabling in law." (internal quotation marks and citation omitted)). Indeed, "[m]edicine or treatment an indigent person cannot afford is no more a cure for his condition than if it had never been discovered." *Lovelace*, 813 F.2d at 59.

This well-settled exception exists because the primary purpose of the Social Security Act is "to give financial assistance to disabled persons because they are without the ability to sustain themselves." *Gamble*, 68 F.3d at 322. To deny benefits to a person because his disability could be prevented by medication that he cannot afford "directly contravene[s]" this purpose. *Id*. Furthermore, "disabled children who live in low-income households are certainly among the most disadvantaged of all Americans and . . . are deserving of special assistance in order to help them become self-supporting members of our society." H.R. Rep. No. 92-231, at 147-48 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 4989, 5133-34.

The case law that requires a claimant's financial situation to be taken into account in an initial SSI disability determination also counsels that such financial considerations be factored into continuing disability reviews in order to fulfill the purposes of the Social Security Act.

The majority justifies its decision to disregard E.T. IV's financial situation, and thereby deny him benefits, by citing a Fifth Circuit case for the proposition that granting benefits to a claimant "when the claimant's impairment is *not* presently disabling, but when the claimant instead seeks SSI benefits as a means of affording medication to prevent his impairment from becoming disabling at an unknown time in the future, could 'open the door to virtually unlimited claims for preventative benefits.' " Maj. op. at 1774 (quoting *Burnside v. Bowen*, 845 F.2d 587, 592 (5th Cir. 1988), *abrogated on other grounds by Sullivan v. Zebley*, 493 U.S. 521, 527 n.5 (1990)). But *Burnside*'s basic assumption regarding future "unlimited claims" is flawed.

The Plaintiff is not only seeking benefits to prevent her son's disability, she is seeking them to prevent his death. If the Plaintiff cannot afford her son's medication and special diet, then it is not only "conceivable," *Burnside*, 845 F.2d at 592, but *certain* that E.T. IV's condition will deteriorate,

resulting in his death if treatment is not resumed. Both Dr. Koeller, an associate professor of pediatrics, and Dr. Grossman, the testifying medical expert, agree that, if untreated, a child with isovaleric acidemia "suffers irreversible and progressive brain damage as well as seizures, acidosis, hyperammonemia, pancytopenia and/or thrombocytopenia, encephalopathy, hypocalcemia, and death." No evidence in the record refutes this dire conclusion.

Therefore, a holding in favor of the Plaintiff would establish a rule that a child with a chronic illness, who was previously approved for SSI benefits, and whose condition improved because of treatment paid for by those benefits, cannot be denied continuing benefits because of that improvement if denial of benefits would result in cessation of treatment and put the child at high risk of brain damage and death. This is not a rule that will give rise to "unlimited claims for preventative benefits." Maj. op. at 1774 (citation omitted). To the contrary, it will fulfill the purpose of SSI by helping a child from a low-income household survive a life-threatening illness.

To prevent E.T. IV from suffering brain damage and death, we should reverse the District Court's decision and remand for reinstatement of E.T. IV's SSI benefits.