**Richard BANKS, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. EDCV 05–0021–RC.**

United States District Court,
C.D. California.

June 13, 2006.

Manuel D. Serpa, Binder & Binder, Santa Ana, CA, for Plaintiff.

Assistant U.S. Attorney, Kathryn M. Ritchie, Ausa—Office of U.S. Attorney, Civil Division, Los Angeles, CA, for Defendant.

## OPINION AND ORDER

CHAPMAN, United States Magistrate Judge.

Plaintiff Richard Banks filed a complaint on January 6, 2005, seeking review of the Commissioner's decision denying his applications for disability benefits. The Commissioner answered the complaint on May 26, 2005, and the parties filed a joint stipulation on August 3, 2005.

## BACKGROUND

### I

On September 3, 1999 (protective filing date), plaintiff filed an application for disability benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 423, and on April 12, 2000, plaintiff filed an application for disability benefits under the Supplemental Security Income ("SSI") program of Title XVI of the Act, 42 U.S.C. § 1382(a), claiming an inability to work since October 10, 1998, due to hypertension, depression and throat cancer.[1] Certified Administrative Record ("A.R.") 81–84, 118, 151, 476–80. Plaintiff's Title II application was denied on February 11, 2000, and both applications were denied on June

---

1. Plaintiff previously filed applications for disability benefits on May 29, 1998, claiming an inability to work since January 16, 1998, due to "collapsed lung and liver trouble[,]" A.R. 78–80, 99, 469–70; however, these applications were denied and not pursued by plaintiff. A.R. 60–63; Jt. Stip. at 2:2–6.

2, 2000, following reconsideration. A.R. 64–73. Plaintiff then requested an administrative hearing, which was held before Administrative Law Judge F. Keith Varni ("the ALJ") on February 8, 2001. A.R. 31–56. On February 26, 2001, the ALJ issued a decision finding plaintiff is not disabled. A.R. 15–22(a). Plaintiff appealed this decision to the Appeals Council, which denied review on April 19, 2002. A.R. 6–14.

Following the Appeals Council's denial, plaintiff filed *Banks v. Barnhart*, case no. EDCV 02–0531–RC ("Banks I").[2] Pursuant to the stipulation of the parties, Judgment in Banks I was entered on March 21, 2003, remanding the matter under sentence four of 42 U.S.C. § 405(g) so the ALJ could "consider the October 2000 opinion of Lisa Perry–Gilkes, M.D., and set forth specific and legitimate reasons should he decide to reject her opinion." A.R. 552–56.

Following remand, an administrative hearing was held before the ALJ, A.R. 511–28, who issued an opinion on April 30, 2004, again finding plaintiff is not disabled. A.R. 503–09. Plaintiff requested review by the Appeals Council, which denied review on October 27, 2004. A.R. 495–502.

## II

Plaintiff, who was born on July 25, 1945, is currently sixty years old. A.R. 34, 78. He has a ninth grade education, and has previously worked as a welder, care provider, and security officer. A.R. 101, 514–16.

In the fall of 1998, plaintiff began to complain of hoarseness, which was initially diagnosed as laryngitis. A.R. 192–94, 412. However, on July 8, 1999, plaintiff underwent a laryngoscopy, A.R. 405–06, which revealed well-differentiated squamous cell carcinoma of the larynx. A.R. 444–45. From July 29 through August 6, 1999, plaintiff was hospitalized at the Arrowhead Regional Medical Center, where he had a total laryngectomy[3] and cricopharyngeal[4] myotomy.[5] A.R. 215–22. Thereafter, plaintiff had radiation therapy, which was completed on October 4, 1999. A.R. 333, 409–10.

Plaintiff had a stoma[6] and a tube inserted in his throat postoperatively, and he was unable to speak; rather, he communicated primarily by gestures and writing. A.R. 215–16, 331–32. By December 2, 1999, however, plaintiff had "a device which allow[ed] him to speak in a whisper[,] ... [and] with very little effort on the listener's part, he [could] make himself understood." A.R. 254.

On February 10, 2000, plaintiff had a tracheoesophageal puncture[7] ("TEP") to assist him in speaking. A.R. 278–80. On February 25, 2000, plaintiff was examined by Lisa Perry–Gilkes, M.D., an ear, nose and throat specialist, who found plaintiff was "permanently disabled" since July 29, 1999, and he must avoid exposing his neck to water. A.R. 232, 390.

---

**2.** Pursuant to Fed.R.Evid. 201, this Court takes judicial notice of all documents in Banks I.

**3.** Laryngectomy is "surgical removal of the larynx." *Dorland's Illustrated Medical Dictionary,* 963 (29th ed.2000).

**4.** Cricopharyngeal means "pertaining to the cricoid cartilage and the pharynx." *Id.* at 419.

**5.** Myotomy is "the cutting or dissection of a muscle or of muscular tissue." *Id.* at 1172.

**6.** A stoma is "any minute pore, orifice, or opening on a free surface." *Dorland's Illustrated Medical Dictionary* at 1703.

**7.** A TEP involves "a one-way plastic valve placed in a surgically-created tracheoesophageal fistula to restore speech after laryngectomy." *Dorland's Illustrated Medical Dictionary* at 1495.

On May 15, 2000, plaintiff was again hospitalized for a stomatoplasty,[8] with partial resection of the sternal heads of the sternocleidomastoid muscle, and a cervical esophagoscopy. A.R. 358–61. There were no complications from these procedures, and plaintiff was discharged from the hospital on May 16, 2000. A.R. 356–57. Because the TEP failed to adequately function, it was removed, and on August 10, 2000, plaintiff underwent another tracheoesophageal puncture, A.R. 352–53, and on September 11, 2000, plaintiff had another voice prosthesis inserted. A.R. 350–51. Although plaintiff initially had some difficulty with the artificial larynx, A.R. 303, by October 30, 2000, his speech was "much improved," A.R. 302, and by November 3, 2000, his speech was "excellent." A.R. 300.

On October 15, 2000, Dr. Perry–Gilkes diagnosed plaintiff as having laryngeal cancer with hoarseness, otalgia,[9] and weight loss, and noted plaintiff "has limited communication ability[,] which is depressing [and] frustrating [to plaintiff] at times." A.R. 487–94. Dr. Perry–Gilkes opined plaintiff: can occasionally lift and/or carry up to 10 pounds; can sit for 5 hours and stand and/or walk for 3 hours in an 8–hour day, but not continuously as he must get up and move around as needed; and plaintiff needs to avoid fumes, gases, temperature extremes and dust, and perform no pushing or pulling. A.R. 489–90, 493. Dr. Perry–Gilkes also opined plaintiff's symptoms were periodically severe enough to interfere with his ability to concentrate and pay attention, and he had demonstrated reasonable fear and stress associated with his disease, although he could emotionally handle low-stress work. A.R. 492. Furthermore, Dr. Perry–Gilkes

opined plaintiff would need to take unscheduled breaks 2–3 times daily, resting for 15–20 minutes before returning to work, plaintiff must have ready access to a bathroom, and plaintiff would miss approximately 2–3 days of work a month due to his condition. A.R. 492–93.

On October 2, 2000, Lien Pham, M.D., examined plaintiff and noted he complained of neck and throat pain, general fatigue and sleepiness, and that pain medication was unable to completely relieve plaintiff's pain without unacceptable side effects, and he had a productive cough. A.R. 291–92. Dr. Pham opined plaintiff: can occasionally lift and/or carry up to 20 pounds; can sit for between 0–1 hours and stand for 1–hour in an 8–hour day; is moderately limited in his ability to reach, grasp or perform fine manipulations with either extremity; cannot push, pull, kneel, bend, or stoop; and needs to avoid wetness, fumes, gases, temperature extremes, and dust. A.R. 292–94. Dr. Pham further opined plaintiff cannot keep his neck in a constant position or perform work requiring keeping his neck in one position for a sustained period of time. A.R. 294–95. Finally, Dr. Pham opined plaintiff's condition would frequently interfere with his attention and concentration, he has psychological limitations, and he is incapable of work involving even low-stress. A.R. 295–96.

On November 30, 2000, plaintiff's prosthesis was replaced under anesthesia. A.R. 347–48. Plaintiff complained of throat pain postoperatively, but on December 8, 2000, Dr. Perry–Gilkes found the prosthesis was in a good position and there were no complications since the surgery. A.R. 629.

---

**8.** Stomatoplasty involves "plastic repair of defects of or reconstruction of the [stoma]." *Dorland's Illustrated Medical Dictionary* at 1705.

**9.** Otalgia is "pain in the ear." *Dorland's Illustrated Medical Dictionary* at 1292.

On January 12, 2004, Rocely Ella–Tamayo, M.D., examined plaintiff and noted he was "using a voice machine because of his inability to phonate. He has chronic tracheostomy. He has chronic cough and occasionally it bleeds sometimes for which he has to take cough medicine all the time." A.R. 664–70. Dr. Ella–Tamayo opined plaintiff "is restricted in pushing, pulling, lifting, and carrying to about 50 pounds occasionally, and about 25 pounds frequently," but is otherwise not restricted. A.R. 669.

## DISCUSSION

### III

The Court, pursuant to 42 U.S.C. § 405(g), has the authority to review the Commissioner's decision denying plaintiff disability benefits to determine if her findings are supported by substantial evidence and whether the Commissioner used the proper legal standards in reaching her decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir.2005); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir.1999).

"In determining whether the Commissioner's findings are supported by substantial evidence, [this Court] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir.1998); *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir.2001). "If the evidence can reasonably support either affirming or reversing the [Commissioner's] conclusion, the court may not substitute its judgment for that of the [Commissioner]." *Reddick*, 157 F.3d at 720–21; *McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir.2002).

The claimant is "disabled" for the purpose of receiving benefits under the Act if he is unable to engage in any substantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). "The claimant bears the burden of establishing a prima facie case of disability." *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir.1995), *cert. denied*, 517 U.S. 1122, 116 S.Ct. 1356, 134 L.Ed.2d 524 (1996); *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir.1996).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed by the ALJ in a disability case. 20 C.F.R. §§ 404.1520, 416.920. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments significantly limiting him from performing basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments, 20 C.F.R. § 404, Subpart P, App. 1, 20 C.F.R. §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite his limitations to perform his past work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show the claimant can perform other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g).

Applying the five-step sequential evaluation process, the ALJ found plaintiff "asserted he had not engaged in substantial gainful activity since the alleged onset date." (Step One). The ALJ then found

plaintiff has "'severe' physical impairments but there is no evidence of any functionally limiting mental impairment." (Step Two). The ALJ further found that plaintiff's impairments do not meet or equal the requirements of the Listing of Impairments at 20 C.F.R., Part 404, Subpart P, Appendix 1. (Step Three).[10] The ALJ then concluded plaintiff is not disabled because he has the residual functional capacity to perform his past relevant work as a welder and a care provider. (Step Four). Alternately, the ALJ found plaintiff is not disabled because he can perform a significant number of jobs in the national economy. (Step Five).

## IV

A claimant's residual functional capacity ("RFC") is what he can still do despite his physical, mental, nonexertional, and other limitations. *Mayes v. Massanari*, 276 F.3d 453, 460 (9th Cir.2001); *Cooper v. Sullivan*, 880 F.2d 1152, 1155 n. 5 (9th Cir.1989). Here, the ALJ found plaintiff has the RFC for medium work [11] "with no exposure to heavy concentrations of respiratory contamination or pollution and no work requiring frequent verbal communication." A.R. 509. However, plaintiff contends the RFC finding is not supported by substantial evidence because he is unable to communicate verbally on a frequent basis and "[i]t was only the ALJ himself, a layperson in medical matters, who opined that [plaintiff] can tolerate all but *heavy concentration* of respiratory contamination or pollution." Jt. Stip. at 12:21–14:23 (emphasis in original).

■ An "'ALJ cannot arbitrarily substitute his own judgment for competent medical opinion ... [,]'" *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998) (citations omitted); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir.1975), and he "must not succumb to the temptation to play doctor and make [his] own independent medical findings." *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996). Rather, the ALJ's RFC determination or finding must be supported by medical evidence, particularly the opinion of a treating or an examining physician. *Cf. Penny v. Sullivan*, 2 F.3d 953, 958 (9th Cir.1993) ("Without a personal medical evaluation it is almost impossible to assess the residual functional capacity of any individual."); *Nelson v. Heckler*, 712 F.2d 346, 348 (8th Cir.1983) (per curiam) ("'[T]o attempt to evaluate disability without personal examination of the individual and without evaluation of the disability as it relates to the particular person is medical sophistry at its best.'" (citation omitted)). However, where "the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict." *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir.2003); *Batson v. Commissioner of the Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir.2004).

■ Here, Dr. Ella–Tamayo diagnosed plaintiff as status post-laryngectomy and tracheostomy, and found he is able to do the full range of medium work, with no speech or environmental limitations. A.R. 664–70. Dr. Ella–Tamayo's opinions constitute substantial evidence to support the

---

**10.** The ALJ made no Step Three finding on remand, but he incorporated by reference his earlier opinion in which he found plaintiff's condition does not meet or equal a listed impairment. A.R. 22, 507; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("Although [ALJ] Kelly did not specifically address Dr. Dawson's opinion, she incorporated by reference ALJ Bernoski's dis-

cussions of the medical evidence[,]" which was supported by substantial evidence).

**11.** Under Social Security regulations, "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).

RFC determination or finding by the ALJ.[12] *Tonapetyan v. Halter,* 242 F.3d 1144, 1149 (9th Cir.2001).

## V

■ "To determine whether a claimant has the residual functional capacity to perform his past relevant work, the [ALJ] must ascertain the demands of the claimant's former work and then compare the demands with his present capacity." *Villa v. Heckler,* 797 F.2d 794, 797–98 (9th Cir. 1986); *Marcia v. Sullivan,* 900 F.2d 172, 177 n. 6 (9th Cir.1990). "This requires specific findings as to the claimant's residual functional capacity, the physical and mental demands of the past relevant work, and the relation of the residual functional capacity to the past work." *Pinto v. Massanari,* 249 F.3d 840, 845 (9th Cir.2001); *Winfrey v. Chater,* 92 F.3d 1017, 1022 (10th Cir.1996).

A claimant will be found "not disabled" when it is determined he retains the RFC to perform: "1. The actual functional demands and job duties of a particular past relevant job; or [¶] 2. The functional demands and job duties of the occupation as generally required by employers throughout the national economy." *Pinto,* 249 F.3d at 845 (9th Cir.2001) (quoting SSR 82–61, 1982 WL 31387 *2 (S.S.A.)); *see also Lewis v. Barnhart,* 281 F.3d 1081, 1083 (9th Cir.2002) ("A claimant must be able to perform [his] past relevant work either as actually performed or as generally performed in the national economy."). "Social Security Regulations name two sources of information that may be used to define a claimant's past relevant work as actually performed: a properly completed vocational report, SSR 82–61, and the claimant's own testimony, SSR 82–41." [13] *Pinto,* 249 F.3d at 845; *Lewis,* 281 F.3d at 1083.

Here, the ALJ found plaintiff can perform his past relevant work as a welder and as a care giver. A.R. 509. Neither of these findings is supported by substantial evidence, as discussed herein. At the administrative hearing, plaintiff testified that his past relevant work as a welder required occasionally lifting up to 100 pounds or more. A.R. 128, 133. Such lifting is heavy work [14]—not medium work; therefore, plaintiff cannot perform his past relevant work as a welder. Nor can plaintiff perform his past relevant work as a welder as that job is performed in the national economy, based on the testimony of vocational expert Joseph Mooney, who testified welding is "[h]eavy and semi-skilled" work.[15] A.R. 50. Therefore, the ALJ's Step Four finding that plaintiff can perform his past relevant work as a welder is not supported by substantial evidence.

■ At the prior administrative hearing, vocational expert Mooney testified that

---

**12.** Significantly, plaintiff does not challenge the ALJ's rejection of the opinions of his treating physicians, Drs. Perry–Gilkes and Pham. *See* A.R. 20, 507–08.

**13.** Social Security Rulings constitute the Social Security Administration's interpretations of the statutes it administers and of its own regulations. *Chavez v. Department of Health & Human Servs.,* 103 F.3d 849, 851 (9th Cir. 1996); *Quang Van Han v. Bowen,* 882 F.2d 1453, 1457 (9th Cir.1989). Although Social Security Rulings do not have the force of law, *Chavez,* 103 F.3d at 851, once published, they are binding upon ALJs and the Commission-

er. *Holohan,* 246 F.3d at 1202–03 n. 1; *Gatliff v. Commissioner of the Soc. Sec. Admin.,* 172 F.3d 690, 692 n. 2 (9th Cir.1999).

**14.** Under Social Security regulations, "[h]eavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds." 20 C.F.R. §§ 404.1567(d), 416.967(d).

**15.** The ALJ incorporated "[t]he vocational expert's testimony at the prior hearing[, finding it] is still applicable...." A.R. 508.

plaintiff's past relevant work as a "care provider" was "medium and unskilled"; however, the vocational expert did not explain the mental and physical requirements of a "care provider" except to note "the care provider would require communication." A.R. 49–51.[16] Plaintiff testified that his job as a "care provider" required him to cook, mow the lawn, and perform janitorial work. A.R. 130. However, no further evidence was adduced as to the requirements of plaintiff's past relevant work as a "care provider," and specifically, the speech requirements of that job were not established. Without specific findings regarding the demands and requirements of a "care provider," the ALJ's Step Four determination or finding that plaintiff can perform his past relevant work as a "care provider" is conclusory and not supported by substantial evidence. *Pinto,* 249 F.3d at 846–47; *see also Sells v. Shalala,* 48 F.3d 1044, 1046 (8th Cir.1995) ("[A] conclusory determination that the claimant can perform past work, without [explicit findings as to the physical and mental demands of the job and the RFC], does not constitute substantial evidence that the claimant is able to return to his or her past work." (citation omitted)); *Latham v. Shalala,* 36 F.3d 482, 484 (5th Cir.1994) ("[W]hen making a finding that an applicant can return to his prior work, the ALJ

must directly compare the applicant's remaining functional capacities with the physical and mental demands of [her] previous work. He must make clear factual findings on that issue. The ALJ may not rely on generic classifications of previous jobs." (citations omitted)).

## VI

At Step Five, the burden shifts to the Commissioner to show the claimant can perform other jobs that exist in the national economy. *Pinto,* 249 F.3d at 844 (9th Cir.2001); *Harman v. Apfel,* 211 F.3d 1172, 1180 (9th Cir.), *cert. denied,* 531 U.S. 1038, 121 S.Ct. 628, 148 L.Ed.2d 537 (2000). To meet this burden, the Commissioner "must 'identify specific jobs existing in substantial numbers in the national economy that [plaintiff] can perform despite [his] identified limitations.'" *Meanel,* 172 F.3d at 1114 (quoting *Johnson v. Shalala,* 60 F.3d 1428, 1432 (9th Cir.1995)). There are two ways for the Commissioner to meet this burden: "(1) by the testimony of a vocational expert, or (2) by reference to the Medical Vocational Guidelines ["Grids"] at 20 C.F.R. pt. 404, subpt. P, app. 2."[17] *Tackett v. Apfel,* 180 F.3d 1094, 1099 (9th Cir.1999); *Osenbrock v. Apfel,* 240 F.3d 1157, 1162 (9th Cir.2001).

■ Here, the ALJ relied on Rules 203.12 [18] and 203.19 [19] of the Grids to de-

---

**16.** The ALJ also failed to make any findings regarding the mental or physical requirements of plaintiff's past relevant work as a "care provider." *See* A.R. 21, 508–09.

**17.** The Grids are guidelines setting forth "the types and number of jobs that exist in the national economy for different kinds of claimants. Each rule defines a vocational profile and determines whether sufficient work exists in the national economy. These rules represent the [Commissioner's] determination, arrived at by taking administrative notice of relevant information, that a given number of unskilled jobs exist in the national economy that can be performed by persons with each

level of residual functional capacity." *Chavez,* 103 F.3d at 851 (citations omitted).

**18.** Rule 203.12 provides that an individual of advanced age who has a limited education, skilled or semi-skilled work experience but no transferable work skills, and is limited to medium work is not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 203.12. The plaintiff reached an "advanced age" when he turned 55 years old. 20 C.F.R. §§ 404.1563(e), 416.963(e).

**19.** Rule 203.19 provides that an individual closely approaching advanced age, who has a limited education, skilled or semi-skilled work experience but no transferable work skills,

termine plaintiff is not disabled. However, the Grids may be used " 'only when the[y] accurately and completely describe the claimant's abilities and limitations." ' *Tackett,* 180 F.3d at 1102 (quoting *Jones v. Heckler,* 760 F.2d 993, 998 (9th Cir.1985)); *Bruton v. Massanari,* 268 F.3d 824, 827–28 (9th Cir.2001). Thus, when a claimant has nonexertional limitations that significantly limit the range of work he can perform, the ALJ may not rely on the Grids and must hear testimony from a vocational expert. *Bruton,* 268 F.3d at 828; *Aukland v. Massanari,* 257 F.3d 1033, 1036 (9th Cir.2001).

■ Recognized nonexertional limitations include both certain environmental limitations, *see,* e.g., *Tackett,* 180 F.3d at 1102 ("Examples of non-exertional limitations are ... environmental limitations."), as well as certain communicative limitations. *See* SSR 96–8p, 1996 WL 374184, *6 (S.S.A.)(Communicative limitations in speaking and hearing are nonexertional); *Patterson v. Barnhart,* 428 F.Supp.2d 869, 885 (E.D.Wis.2006) (Limitations in ability to speak are nonexertional). However, a nonexertional limitation to work involving "no exposure to heavy concentrations of respiratory contamination or pollution," as plaintiff has, is not a significant nonexertional limitation precluding the use of the Grids. *See,* e.g., SSR 85–15, 1985 WL 56857 *8 (S.S.A.) ("Where a person has a medical restriction to avoid **excessive** amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc.") (emphasis added). On the other hand, since "[c]ommunication is an important factor in work[,]" SSR 85–15, 1985 WL 56857 at *7, the nonexertional limitation of "no work requiring frequent verbal com-

munication" may constitute a significant nonexertional limitation precluding the use of the Grids. *See,* e.g., *O'Connell v. Apfel,* 1999 WL 97905, *6 (E.D.N.Y.) (ALJ erred in relying on Grids rather than calling vocational expert when claimant had speech difficulties). Nevertheless, since the ALJ here did not rely solely on the Grids, but also relied on the testimony of vocational expert Mooney to determine plaintiff is not disabled, *see* A.R. 508 ("The vocational expert's testimony at the prior hearing is still applicable ... [plaintiff can] perform the alternative work cited by him."), the ALJ's application of the Grids was harmless error. *See Burch,* 400 F.3d at 679 ("A decision of the ALJ will not be reversed for errors that are harmless.").

Here, the ALJ posed the following hypothetical question to vocational expert Mooney:

Q. All right. I'd like you to consider ... a person of the Claimant's background and consider that there are no exertional limits and work is possible at any exertional level. Consider, however, that the work should not expose the worker to heavy concentrations of respiratory contamination or pollution, **and should not require frequent verbal communication....** Would there be any unskilled work that could be performed within the limits I've asked you to assume here?

A. Considering unskilled occupations only, yes, there would be many simple routing assembly positions. There would be hand packagers, sorters and graders primarily in manufacturing, and there'd be bundlers in the garment industry.

Q. And the numbers of those jobs in the regional economy of Los Angeles,

and is limited to medium work is not disabled. 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 203.19. A person "closely approaching

advanced age" is an individual between the ages 50 and 54. 20 C.F.R. §§ 404.1563(d), 416.963(d).

Orange, Riverside, and San Bernardino Counties?

A. In the broad regional economy they exist in numbers well in excess of 5,000.

A.R. 50–52 (emphasis added). The plaintiff's attorney and vocational expert Mooney then clarified that the identified jobs are within plaintiff's exertional and nonexertional limitations:

Q. The positions that you've just identified in the unskilled workforce [sic] . . ., would those be performed—at what level would those be performed, light, sedentary. . . .

A. Essentially the light range and also the medium range and sedentary but the majority of them would exist in the light range.

Q. What—the assembly position, what type of work does that involve?

A. It requires bench level work of assembling various types of components. It could be metal, it could [be] plastic, it could be leather.

Q. If you—now one of the restrictions that was suggested was no frequent verbal communication. Would no frequent—would a person who is limited in his ability to verbally communicate frequently have any difficulty performing that job?

A. I would say no because they tend to be observatory and they're given instruction and if you need help, it's simply signaling or asking for assistance.

Q. But there would be communication obviously with supervisors?

A. There'd be a requirement for a degree but it would be minimal.

Q. And is that also true of communication with coworkers?

A. Usually coworkers at these types of jobs you would simply learn how to signal each other and they know exactly what they mean so . . . .

\*     \*     \*

Q. Are any of these positions typically performed where—in facilities where there's a great deal of dust, for example assembly? Are those facilities—do they create any kind of problem typically for somebody, you know, who may not be able to be exposed to dust?

A. These tend to be fairly clean environments but not totally free of say for example dust or perfume or this sort of thing.

A.R. 52–54. Based on the testimony of vocational expert Mooney, which plaintiff does not challenge, there is substantial evidence to support the ALJ's Step Five determination that plaintiff can perform a significant number of jobs in the national economy and, thus, is not disabled. Judgment should, accordingly, be entered in favor of the Commissioner.

### ORDER

IT IS ORDERED that: (1) plaintiff's request for relief is denied; and (2) the Commissioner's decision is affirmed, and Judgment shall be entered in favor of defendant.

### JUDGMENT

IT IS ADJUDGED that Judgment shall be entered in favor of defendant.