**Jerrett TAGGER, Plaintiff,**

**v.**

**Michael J. ASTRUE,[1] Commissioner of Social Security, Defendant.**

**No. CV 06–5250–RC.**

United States District Court,
C.D. California.

Jan. 24, 2008.

---

**1.** Pursuant to Fed.R.Civ.P. 25(d)(1), Michael J. Astrue is substituted as the defendant in this action.

Suzanne C. Leidner, Leidner & Leidner, Los Angeles, CA, for Plaintiff.

Assistant U.S. Attorney LA–SSA, Office of the General Counsel for Social Security Adm., San Francisco, CA, Cedina M. Kim, Office of U.S. Attorney, Los Angeles, CA, for Defendant.

## OPINION AND ORDER

ROSALYN M. CHAPMAN, United States Magistrate Judge.

Plaintiff Jerrett Tagger filed a complaint on August 23, 2006, seeking review of the Commissioner's decision denying his applications for disability benefits. The Commissioner answered the complaint on February 6, 2007, and the parties filed a joint stipulation on March 27, 2007.

## BACKGROUND

### I

On February 11, 2002, plaintiff applied for disability benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. § 423, and the Supplemental Security Income program ("SSI") of Title XVI of the Act, 42 U.S.C. § 1382(a), claiming an inability to work since June 1, 1985, due to schizophrenia and headaches. Certified Administrative Record ("A.R.") 78–80, 102, 303–05. The plaintiff's applications were denied on May 23, 2002. A.R. 37–41. The plaintiff then requested an administrative hearing; however, after plaintiff failed to attend a scheduled hearing, his request for a hearing was dismissed. A.R. 32–34, 42–44. The plaintiff sought review of the dismissal, and, on March 5, 2004, the Appeals Council remanded the matter to afford plaintiff an administrative hearing. A.R. 49–55. On November 17, 2005, an administrative hearing was held before Administrative Law Judge Alexander Weir III ("the ALJ"). A.R. 309–23. On February 13, 2006, the ALJ issued a decision finding plaintiff is not disabled. A.R. 12–28. The plaintiff appealed this decision to the Appeals Council, which denied review on June 25, 2006. A.R. 6–11.

### II

The plaintiff, who was born on June 23, 1958, is currently 49 years old. A.R. 78,

303. He has an eighth-grade education, and has not worked in the past 15 years. A.R. 102, 108, 134.

The plaintiff has a well-documented history of mental illness.[2] On November 26, 1996, plaintiff received mental health treatment at the Los Angeles County Department of Mental Health ("DMH"), where he was diagnosed with an unspecified psychotic disorder and an unspecified adjustment disorder and his Global Assessment of Functioning ("GAF") was determined to be 35,[3] with highest in the past year of 50.[4] A.R. 136–44, 193–207. On April 2, 1997, DMH discharged plaintiff from treatment after he missed multiple appointments. A.R. 144. On August 29, 1997, plaintiff was again evaluated at DMH, where M. Giurgius, M.D., diagnosed him as having an unspecified psychotic disorder, rule out persistent substance-induced psychotic disorder and undifferentiated schizophrenia and malingering, and prescribed Thorazine.[5] A.R. 142. On January 21, 1998, DMH again discharged plaintiff from treatment due to *nonattendance*. A.R. 136.

On or about April 7, 1999, plaintiff was incarcerated, and began mental health treatment by various prison psychologists. psychiatrists, and others. A.R. 146–91. On April 14, 1999, Bruce Bogost, M.D., examined plaintiff and diagnosed him with chronic undifferentiated schizophrenia, polysubstance dependence, and borderline intellectual functioning, after determining plaintiff's IQ was between 65 and 70. A.R. 187–88. On April 30, 1999, R. Martell, Ph.D., found plaintiff's GAF was 56.[6] A.R. 181. That same day, S.K. Stack, Ph.D., diagnosed plaintiff with an anti-social personality disorder, rule out schizoaffective disorder. A.R. 178–80. On May 12, 1999, Stephen Karpman, M.D., examined plaintiff, diagnosed him with chronic schizophrenia, and noted plaintiff had a flat affect and hallucinated voices and visions. A.R. 176. The plaintiff complained his medication was not working and he was experiencing blurred vision and dysuria; therefore, Dr. Karpman discontinued one of plaintiff's medications and increased plaintiff's prescription of Haldol.[7] *Id.*

2. Although plaintiff has both mental and physical complaints, this opinion addresses only plaintiff's mental complaints.

3. A GAF of 31–40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed. (Text Revision) 2000).

4. A GAF of 41–50 means that the plaintiff exhibits "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.*

5. "Thorazine is used for the reduction of symptoms of psychotic disorders such as schizophrenia; for the short-term treatment of severe behavioral disorders in children, including explosive hyperactivity and combativeness; and for the hyperenergetic phase of manic-depressive illness...." *The PDR Family Guide to Prescription Drugs*, 672 (8th ed.2000).

6. A GAF of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34.

7. "Haldol is used to reduce the symptoms of mental disorders such as schizophrenia." *The PDR Family Guide to Prescription Drugs* at 301.

On February 4, 2000, Walter J. Wilcox, M.D., a psychiatrist, diagnosed plaintiff with probable paranoid schizophrenia and determined plaintiff's GAF was 65.[8] A.R. 168. On July 14, 2000, Dr. Reichardt diagnosed plaintiff with chronic paranoid schizophrenia, and noted plaintiff was stable. A.R. 166. On November 3, 2000, Bruce Bakeman, Ph.D., diagnosed plaintiff with paranoid schizophrenia, opined plaintiff "suffers from a mental disorder which makes it impossible for him to function in close proximity to others" and his condition precludes learning at school, and requested plaintiff be removed from school and placed on the waiting list for a job, such as porter, where he can move around and not be in close, continuous proximity to other inmates. A.R. 164–65. On December 14, 2000, plaintiff was sent to the infirmary because his medications were not controlling his symptoms, he was hearing voices, his legs were shaking, and he was confused. A.R. 164. On December 14, 2000, V. Kamdar, M.D., examined plaintiff, diagnosed him with schizophrenia with prominent negative symptoms and akathisia,[9] and noted plaintiff was constantly changing legs (based on his observation of noticeable leg movement) and was hearing voices even when he took his medication, although the voices got worse when he stopped taking the medication. A.R. 163.

On June 11 and September 6, 2001, Dr. Kamdar noted plaintiff was doing fine and was medication compliant. A.R. 157–158. On November 28, 2001, J. Howlin, Ed.D, a psychologist, diagnosed plaintiff with schizophrenia, and noted plaintiff was again hearing voices. A.R. 155. On December 10, 2001, Bill Zizka, Ph.D., a psychologist, diagnosed plaintiff with chronic undifferentiated schizophrenia, and noted plaintiff was hearing voices and very stressed about working in the kitchen. A.R. 154. Dr. Zizka opined plaintiff "has a chronic mental illness and is not stable enough to cope with the demands and stress of culinary work. He should be unassigned from this kind of work on psychiatric grounds...." A.R. 167.

On January 2, 2002, Joe Reed, Ph.D., a psychologist, diagnosed plaintiff with chronic paranoid schizophrenia and borderline intellectual functioning, and opined plaintiff cannot read or write. A.R. 153. On January 7, 2002, Dr. Reed further opined plaintiff was substantially below his peers in academic achievement and needs assistance managing money; however, plaintiff has adequate social and leisure skills. A.R. 146–50. On April 17, 2002, Ernest Bagner, M.D., a psychiatrist, examined plaintiff and diagnosed him with an unspecified depressive disorder, rule out unspecified psychotic disorder, and polysubstance abuse (in remission), and opined plaintiff's GAF was 58. A.R. 208–11. Dr. Bagner found:

> Presently, the [plaintiff] is markedly dysphoric and anxious. He looks around the room in a suspicious manner. The [plaintiff] is guarded and he is disheveled with poor grooming. He has marked difficulty interacting with staff and interviewer, due to his depressed

8. A GAF of 61–70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34.

9. Akathisia is "a condition of motor restlessness in which there is a feeling of muscular quivering, an urge to move about constantly, and an inability to sit still, a common extrapyramidal side effect of neuroleptic drugs." *Dorland's Illustrated Medical Dictionary,* 42 (29th ed.2000).

mood and suspiciousness. [¶] The [plaintiff] would have moderate limitations completing simple tasks and maintaining concentration and attention. He would have marked limitations interacting with supervisors, peers and the public and handling normal stresses at work. The [plaintiff] would also have marked limitations completing complex tasks and completing a normal work week without interruption.

A.R. 211.

On May 13, 2002, Mark Salib, M.D., a nonexamining psychiatrist, diagnosed plaintiff with depression, an anti-social personality disorder, and polysubstance abuse. A.R. 212–25. Dr. Salib opined plaintiff has "mild" restrictions in his activities of daily living; "moderate" difficulty maintaining social functioning; "mild" difficulties maintaining concentration, persistence or pace; and there is "insufficient evidence" of any episodes of decompensation. A.R. 222. Dr. Salib also opined plaintiff is "moderately" limited in his ability to understand, remember and carry out detailed instructions and interact appropriately with the general public; but is otherwise not significantly limited and is capable of at least simple repetitive tasks. A.R. 226–28.

On May 24, 2005, Roger A. Izzi, Ph.D., a clinical psychologist, examined plaintiff, performed psychological testing, and diagnosed plaintiff with polysubstance dependence (in remission by medical record review only), an unspecified depressive disorder, and an unspecified cognitive disorder manifested by deficits in the level of intellectual functioning. A.R. 239–44. Dr. Izzi administered the Wechsler Adult Intelligence Scale—III ("WAIS–III") test to plaintiff, who scored a verbal IQ of 74, a performance IQ of 67, and a full scale IQ of 68, and Dr. Izzi determined these scores were valid. A.R. 242. Dr. Izzi further opined:

The [plaintiff's] fund of information, and factual knowledge, which reflects long-term memory abilities, as well as his word knowledge and verbal fluency, ranged from the Extremely Low Range to Borderline Range. His ability to think abstractly was within the Borderline Range. Concentration and freedom from distractibility, as required by the Arithmetic subtest were within the Extremely Low Range. Immediate auditory memory, attention, concentration and auditory sequencing abilities were within the Low Average Range. Social judgment and social reasoning were within the Borderline Range. [¶] On tests of a nonverbal nature, visual memory, attentional focusing and alertness to visual details were within the Borderline Range. Psychomotor speed and visual motor coordination were within the Extremely Low Range. Visual analysis and synthesis skills ranged from the Extremely Low Range to Borderline Range.

*Id.* Finally, Dr. Izzi opined plaintiff is "markedly" limited in his ability to understand, remember, and carry out detailed instructions, interact appropriately with the public, supervisors, and co-workers. respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting; and "slightly" limited in his ability to understand, remember, and carry out detailed instructions. A.R. 245–47.

On May 27, 2005, Jobst Singer, M.D., a psychiatrist, examined plaintiff and diagnosed him as having unspecified depression with psychotic features and determined plaintiff's GAF was 55. A.R. 232–35. Dr. Singer also noted plaintiff cannot read well and could not fill out a questionnaire. A.R. 233. Dr. Singer opined:

[Plaintiff's] ability to understand, remember and perform instructions is

mildly impaired for simple tasks and moderately impaired for complex tasks. Although persistence cannot be fully evaluated in an evaluation of this type, no psychiatric factors were identified that would significantly interfere with the [plaintiff's] ability to complete a normal day of work. The [plaintiff's] judgment showed no significant impairment during the interview that would increase safety risks above normal in the usual work setting. [¶] ... [T]he [plaintiff's] ability to relate and interact with co-workers and the public, as well as the ability to be supervised, is somewhat impaired by his mental slowness. A.R. 235. Dr. Singer further opined plaintiff is "moderately" limited in his ability to understand, remember, and carry out detailed instructions, interact appropriately with the public, supervisors, and co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting; and "slightly" limited in his ability to understand, remember and carry out simple instructions and make judgments on simple work-related decisions. A.R. 236–38.

Between April 14 and September 21, 2005, Clark Feldman, M.D., treated plaintiff, diagnosed plaintiff with an unspecified psychotic disorder with auditory hallucinations, paranoia, and poor sleep and concentration, and prescribed medication to plaintiff, including Ability.[10] A.R. 250–52, 295–302. On September 26, 2005, Dr. Feldman opined plaintiff does **not** have the ability to engage in and sustain competitive employment in that he has poor or no ability to (or "marked" limitations in his ability to): remember work-like procedures; understand, remember and carry out detailed instructions; maintain attention for two-hour segments; maintain regular attendance and be punctual within customary,

usually strict, tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; complete a normal work day and work week without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; deal with normal work stress; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others, and he has a fair ability (or "moderate" limitations) to understand, remember, and carry out short and simple instructions. A.R. 252–54.

## DISCUSSION

### III

■ The Court, pursuant to 42 U.S.C. § 405(g), has the authority to review the Commissioner's decision denying plaintiff disability benefits to determine if his findings are supported by substantial evidence and whether the Commissioner used the proper legal standards in reaching his decision. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1035 (9th Cir.2007); *Hoopai v. Astrue,* 499 F.3d 1071, 1074 (9th Cir.2007).

■ The claimant is "disabled" for the purpose of receiving benefits under the Act if he is unable to engage in any sub-

---

**10.** Abilify is used to treat schizophrenia. *Phy-* *sician's Desk Reference,* 1027 (59th ed.2005).

stantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). "The claimant bears the burden of establishing a prima facie case of disability." *Roberts v. Shalala,* 66 F.3d 179, 182 (9th Cir.1995), *cert. denied,* 517 U.S. 1122, 116 S.Ct. 1356, 134 L.Ed.2d 524 (1996); *Smolen v. Chater,* 80 F.3d 1273, 1289 (9th Cir.1996).

The Commissioner has promulgated regulations establishing a five-step sequential evaluation process for the ALJ to follow in a disability case. 20 C.F.R. §§ 404.1520, 416.920. In the **First Step,** the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the **Second Step,** the ALJ must determine whether the claimant has a severe impairment or combination of impairments significantly limiting him from performing basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). If so, in the **Third Step,** the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. § 404, Subpart P, App. 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). If not, in the **Fourth Step,** the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If not, in **Step Five,** the burden shifts to the Commissioner to show the claimant can perform other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). Moreover, where there is evidence of a mental impairment that may prevent a claimant from working, the Commissioner has supplemented the five-step sequential evaluation process with additional regulations addressing mental impairments. *Maier v. Comm'r of the Soc. Sec. Admin.,* 154 F.3d 913, 914 (9th Cir. 1998) (per curiam). First, the ALJ must determine the presence or absence of certain medical findings relevant to the ability to work. 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1). Second, when the claimant establishes these medical findings, the ALJ must rate the degree of functional loss resulting from the impairment by considering four areas of function: (a) activities of daily living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(2–4), 416.920a(c)(2–4). Third, after rating the degree of loss, the ALJ must determine whether the claimant has a severe mental impairment. 20 C.F.R. §§ 404.1520a(d), 416.920a(d). Fourth, when a mental impairment is found to be severe, the ALJ must determine if it meets or equals a Listing. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if a Listing is not met, the ALJ must then perform a residual functional capacity assessment, and the ALJ's decision "must incorporate the pertinent findings and conclusions" regarding plaintiff's mental impairment, including "a specific finding as to the degree of limitation in each of the functional areas described in [§§ 404.1520a(c)(3), 416.920a(c)(3) ]." 20 C.F.R. §§ 404.1520a(d)(3), (e)(2), 416.920a(d)(3), (e)(2).

However, "[a] finding of 'disabled' under the five-step inquiry does not automatically qualify a claimant for disability benefits." *Bustamante v. Massanari,* 262 F.3d 949, 954 (9th Cir.2001); *Parra v. Astrue,* 481 F.3d 742, 746 (9th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 1068, 169 L.Ed.2d 808 (2008). Rather, the Act was amended in 1996 to "preclude[ ] the award of benefits to certain claimants whose disability is based, in whole or in

part, on alcoholism and drug addiction or either of them." Pub.L. No. 104–121, 110 Stat. 847, 852 (1996). Thus, the Act now provides that "[a]n individual shall not be considered disabled ... if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).

■ "The 'key factor ... in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability' is whether an individual would still be found disabled if [he] stopped using alcohol or drugs." *Sousa v. Callahan,* 143 F.3d 1240, 1245 (9th Cir. 1998) (citation omitted); *see also* 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1) (same). "In making this determination, [the ALJ] will evaluate which of [the claimant's] current physical and mental limitations ... would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). "If the remaining limitations would still be disabling, then the claimant's drug addiction or alcoholism is not a contributing factor material to his disability." *Parra,* 481 F.3d at 747. "If [the] ... remaining limitations would not be disabling, [the ALJ] will find that [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability [,]" 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i); *Parra,* 481 F.3d at 747, and benefits will be denied.

Applying the enhanced five-step sequential evaluation process, the ALJ found plaintiff has not engaged in substantial gainful activity since the alleged onset of disability. (Step One). The ALJ then found plaintiff has a severe impairment, substance abuse addiction (Step Two), which meets the requirements of Listing 12.09. (Step Three). However, the ALJ did not find plaintiff has any other severe mental or physical impairment. Since the only severe impairment is substance abuse addiction, the ALJ further determined that:

> without regard to [plaintiff's] drug use, he would not have a severe mental or physical impairment.... His psychotic disorder, considered without regard to his use of drugs, would be controlled with medication and would cause only mild restriction in his daily living activities and mild limitations on his social functioning and ability to maintain concentration, persistence and pace. It has not caused any episodes of decompensation of extended duration. Therefore, [plaintiff] would not have a severe mental impairment absent his drug use.

*Id.* As such, the ALJ concluded "drug dependence is material to the determination of [plaintiff's] disability" and plaintiff "is not eligible for disability insurance benefits or [SSI] payments based on disability and has not been so eligible at any time through the date of this decision." *Id.*

**IV**

■ The Step Two inquiry is "a de minimis screening device to dispose of groundless claims." *Smolen,* 80 F.3d at 1290; *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir.2005). The Supreme Court has recognized that including a severity requirement at Step Two of the sequential evaluation process "increases the efficiency and reliability of the evaluation process by identifying at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education, and experience were taken into account." *Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987). However, an overly stringent application of the severity requirement violates the Act by denying benefits to claimants who do meet the statutory definition of dis-

abled, *Corrao v. Shalala,* 20 F.3d 943, 949 (9th Cir.1994).

■ A severe impairment or combination of impairments within the meaning of Step Two exists when there is more than a minimal effect on an individual's ability to do basic work activities. *Webb,* 433 F.3d at 686; *Mayes v. Massanari,* 276 F.3d 453, 460 (9th Cir.2001); *see also* 20 C.F.R. §§ 404.1521(a), 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit [a person's] physical or mental ability to do basic work activities."). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling, as well as the capacity for seeing, hearing and speaking, understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b); *Webb,* 433 F.3d at 686. If the plaintiff meets his burden of demonstrating he suffers from an impairment affecting his ability to perform basic work activities, "the ALJ must find that the impairment is 'severe' and move to the next step in the SSA's five-step process." *Edlund v. Massanari,* 253 F.3d 1152, 1160 (9th Cir.2001) (emphasis in original); *Webb,* 433 F.3d at 686.

■ Initially, the ALJ erred in failing to find plaintiff's borderline intellectual func-

tioning to be a severe impairment. As early as 1999, Dr. Bogost opined plaintiff has borderline intellectual functioning with an IQ between 65 and 70, which would place plaintiff in the mentally retarded range.[11] A.R. 187. Similarly, when evaluating plaintiff before his release on parole in 2002, Dr. Reed diagnosed plaintiff with borderline intellectual functioning, and found plaintiff cannot read or write and is substantially below his peers in academic achievement. A.R. 148, 153. Most recently, in 2005, Dr. Izzi administered the WAIS–III IQ test to plaintiff, and determined plaintiff had a valid verbal IQ of 74, a valid performance IQ of 67, and a valid full scale IQ of 68.[12] A.R. 242. Yet, the ALJ's decision addresses plaintiff's intellectual functioning solely by stating: "It is not possible to separate the [plaintiff's] depressive and cognitive symptoms from the effects of his ongoing drug use." A.R. 26. This is simply not true. There is absolutely no evidence in the record suggesting plaintiff's borderline intellectual functioning would improve if he were to abstain from all alcohol and drug usage. To the contrary, plaintiff was found to have borderline intellectual functioning at the end of his prison term when he had presumably not used alcohol or drugs for several years. A.R. 148, 153, 187. Since borderline intellectual functioning is a severe mental impairment, *see,* e.g., *Nicola v. Astrue,* 480 F.3d 885, 887 (8th Cir.2007) ("A diagnosis of borderline intellectual functioning should be considered severe when the diagnosis is supported by sufficient medical evidence."); *Hunt v. Massa-*

---

11. Borderline intellectual functioning means an I.Q. within the 71–84 range, while mental retardation is defined as an I.Q. score of about 70 or below. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 39–40, 684 (4th ed.1994); *Hutsell v. Massanari,* 259 F.3d 707, 709 n. 3 (8th Cir.2001).

12. The ALJ's opinion that "there is strong evidence that the [plaintiff] was engaging in ongoing drug abuse" when Dr. Izzi examined him is not supported by substantial evidence. To the contrary, Dr. Izzi tested plaintiff for drug usage—including amphetamines, barbiturates, benzodiazepines, marijuana, cocaine metabolite, methadone, opiates, PCP, and alcohol—and the test results were negative. A.R. 248.

*nari,* 250 F.3d 622, 625 (8th Cir.2001) (same), the ALJ's Step Two determination that plaintiff does not have a severe mental impairment except for substance abuse is not supported by substantial evidence.

■ Similarly, the ALJ erred in Step Two in failing to find plaintiff's psychotic disorder is a severe impairment. A.R. 26. More specifically, the ALJ found:

> I conclude from the evidence that the [plaintiff's] mental impairment of a psychotic disorder, if the [plaintiff's] drug abuse were to cease, would cause only mild restrictions of the [plaintiff's] daily living activities and mild limitation on his social functioning and ability to maintain concentration, persistence and pace. It has not caused any episodes of decompensation of extended duration.

A.R. 26. In reaching this conclusion, the ALJ erroneously found "the prison records overall convey that [plaintiff] did not have significant psychotic problems while on his medications." A.R. 26. Although "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [disability] benefits[,]" *Warre v. Comm'r of the Soc. Sec. Admin.,* 439 F.3d 1001, 1006 (9th Cir.2006); *Montijo v. Sec. of Health & Human Servs.,* 729 F.2d 599, 600–01 (9th Cir.1984) (per curiam), the prison records, here, clearly demonstrate plaintiff continued to experience auditory hallucinations and other severe problems even while taking medication. *See,* e.g., A.R. 154–55, 163–64, 169, 176. For instance, on November 3, 2000, Dr. Bakeman noted plaintiff continued to "suffer[ ] from a mental disorder which makes it impossible for him to function in close proximity to others," and requested plaintiff be removed from school because of his paranoia. A.R. 164–65. Similarly, after plaintiff was assigned to work in the prison kitchen, Dr. Zizka opined plaintiff "has a chronic mental illness and is not stable enough to cope with the demands and stress of culinary work. He should be unassigned from this kind of work on psychiatric grounds...." A.R. 167. Therefore, for this reason as well, substantial evidence does not support the ALJ's Step Two determination that, without considering plaintiff's substance abuse, plaintiff does not have a severe mental impairment. *Salazar v. Barnhart,* 468 F.3d 615, 624–26 (10th Cir.2006). Rather, the medical opinions of Drs. Bakeman and Zizka demonstrate that even while petitioner was incarcerated, and presumably not abusing drugs or alcohol, he continued to experience psychotic symptoms impacting his ability to perform basic work activities, i.e., a severe mental impairment. *Edlund,* 253 F.3d at 1159–60.

■ Finally, the record contains no medical evidence about the effect on plaintiff's psychotic condition if he were to abstain from all drug and alcohol usage. As such, the ALJ did not live up to his duties and obligations to develop the record in this regard.[13] *See Balsamo v. Chater,* 142 F.3d 75, 81 (2d Cir.1998) (An " 'ALJ cannot arbitrarily substitute his own judgment

---

13. " 'In Social Security cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered.' " *Smolen,* 80 F.3d at 1288 (citation omitted); *Widmark v. Barnhart,* 454 F.3d 1063, 1068 (9th Cir.2006); *see also Higbee v. Sullivan,* 975 F.2d 558, 561 (9th Cir.1992) (per curiam) ("We have long recognized that the ALJ is not a mere umpire at [an administrative hearing], but has an independent duty to fully develop the record...."). This duty exists regardless of whether the plaintiff is represented by counsel, *Celaya v. Halter,* 332 F.3d 1177, 1183 (9th Cir.2003); *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir.2001), and it is "heightened where the claimant may be mentally ill and thus unable to protect [his] own interests." *Tonapetyan,* 242 F.3d at 1150; *Higbee,* 975 F.2d at 562. "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to Conduct an appropriate

for competent medical opinion .... ' " (citations omitted)); *Day v. Weinberger,* 522 F.2d 1154, 1156 (9th Cir.1975) (same). Rather, the ALJ's determination or finding "must be supported by medical evidence, particularly the opinion of a treating or an examining physician." *Banks v. Barnhart,* 434 F.Supp.2d 800, 805 (C.D.Cal.2006); *see also Mathious v. Barnhart,* 490 F.Supp.2d 833, 847 (E.D.Mich.2007) ("The ALJ is not a medical doctor, psychiatrist or psychologist and is therefore not qualified to determine whether someone's functional limitations and IQ scores are the product of alcohol or drug usage without some competent evidence [supporting the finding].... "). At the very least, on remand, the ALJ should solicit opinions from plaintiff's treating physicians and/or have a medical expert testify about what limitations, if any, plaintiff would continue to experience if his substance abuse ceased. *See Brueggemann v. Barnhart,* 348 F.3d 689, 695 (8th Cir.2003) ("[W]hen the claimant is actively abusing alcohol or drugs, th[e] determination [of which limitations would remain when the effects of the substance abuse disorders are absent] will necessarily be hypothetical and therefore more difficult than the same task when the claimant has stopped. Even though the task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point just as he would on any other." (citation and footnote omitted)).

## V

▮ When the Commissioner's decision is not supported by substantial evidence, the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g);

*McCartey v. Massanari,* 298 F.3d 1072, 1076 (9th Cir.2002). "Generally when a court ... reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.' " *Benecke v. Barnhart,* 379 F.3d 587, 595 (9th Cir.2004) (citations omitted); *Moisa v. Barnhart,* 367 F.3d 882, 886 (9th Cir., 2004). Here, remand is appropriate because the ALJ erred in Step Two in several regards, *see Edlund,* 253 F.3d at 1160 (reversing and remanding where ALJ's conclusion claimant does not have severe mental impairment is not supported by substantial evidence), and additional medical evidence is needed to determine whether plaintiff's substance abuse is a contributing factor material to plaintiff's disability.

## ORDER

IT IS ORDERED that: (1) plaintiff's request for relief is granted; and (2) the Commissioner's decision is reversed, and the action is remanded to the Social Security Administration for further proceedings consistent with this Opinion and Order, pursuant to sentence four of 42 U.S.C. § 405(g), and Judgment shall be entered accordingly.

## JUDGMENT

IT IS ADJUDGED that Judgment be entered remanding the action to the Social Security Administration for further proceedings consistent with the Opinion and Order, pursuant to sentence four of 42 U.S.C. § 405(g).

---

inquiry.' " *Tonapetyan,* 242 F.3d at 1150 (citations omitted); *Webb,* 433 F.3d at 687. Here, there is not a single medical opinion in the record addressing whether plaintiff would remain disabled absent his substance abuse; thus, the record is incomplete and requires supplementation.